UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Don Huizenga, Nancy Powell, and Jim Bendtsen, | Civ. No. 20-2445 (JWB/ECW) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Independent School District No. 11, and Anoka-Hennepin Education Minnesota *(American Federation of Teachers Local 7007)*, | |
| Defendants. | |

---

Douglas P. Seaton, Esq., and James V.F. Dickey, Esq., Upper Midwest Law Center, counsel for Plaintiffs.

Kristin C. Nierengarten, Esq., and Michael J. Waldspurger, Esq., Rupp, Anderson, Squires & Waldspurger, counsel for Defendant Independent School District No. 11.

David Aron, Esq., Eva Wood, Esq., and Margaret A. Luger-Nikolai, Education Minnesota; and Faaris Akremi, Esq., and Leon Dayan, Esq., Bredhoff & Kaiser, PLLC, counsel for Defendant Anoka-Hennepin Education Minnesota.

---

This is a Section 1983 lawsuit brought by certain municipal taxpayers against their school district and local teachers union. Plaintiffs Don Huizenga, Nancy Powell, and Jim Bendtsen challenge a provision in Defendant Independent School District 11's ("ISD 11") collective bargaining agreement with Defendant Anoka-Hennepin Education Minnesota ("AHEM"). AHEM is the local affiliate of a trade union representing educators in Minnesota. Under the collective bargaining agreement, the 3,000 teachers working for ISD 11 are collectively permitted to use up to 100 days per school year to

conduct AHEM business. AHEM must reimburse the school district for the cost of substitute teachers for union leave time ("union leave" policy). Plaintiffs allege that the teachers engage in political advocacy during the union leave which violates Plaintiffs' free speech rights under both federal and state constitutions and violates the state Public Employer Labor Relations Act. Not all background facts will be recited here and can be found in other reported decisions. *See Huizenga v. Indep. Sch. Dist. No. 11*, 544 F. Supp. 3d 862 (D. Minn., June 18, 2021), *rev'd*, 44 F.4th 806 (8th Cir. 2022).

The district court at first dismissed this action for lack of standing, a ruling that was appealed and that the Eighth Circuit reversed. *Id*. The Eighth Circuit restricted its analysis to the face of the pleadings, finding that Plaintiffs' Complaint adequately alleged municipal taxpayer standing in ISD 11 sufficient to satisfy a threshold inquiry on a motion to dismiss. *Huizenga*, 44 F.4th at 811–12.

After remand from the Eighth Circuit, the parties conducted discovery and have cross-moved for summary judgment. (Doc. Nos. 91, 101.) Based on a fully developed record, Plaintiffs' claims are dismissed for lack of Article III standing.

Plaintiffs clearly enough identify the school district activity they challenge and most of the Plaintiffs appear to be municipal taxpayers in ISD 11. But what Plaintiffs have not done sufficiently is to establish that municipal taxpayer revenues, as opposed to other revenue sources, were in fact spent on the ISD 11 contested activity. Accordingly, Plaintiffs lack standing and Defendant AHEM's motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied as moot.

## ANALYSIS

Article III standing is a prerequisite to a federal court's subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). The party invoking federal jurisdiction bears the burden of establishing standing. *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (citing *Lujan*, 504 U.S. at 561). A plaintiff must generally show: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct of the defendant; and (3) a likelihood that a favorable ruling will redress the alleged injury. *Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005). Article III requires "an injury [to] be *concrete*, particularized*,* and *actual* or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (emphasis added). "An alleged injury cannot be too speculative for Article III purposes." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014).

The general rule is that plaintiffs cannot maintain a lawsuit based solely on their taxpayer status, but municipal taxpayer standing is the exception to that rule. *See Frothingham v. Mellon*, 262 U.S. 447, 487 (1923). Typically, citizens' financial interest in how a government spends their tax dollars is an issue of public concern best resolved in the political arena and not in the courts. The exception for municipal taxpayers is based on the "peculiar," more direct relationship between a taxpayer and their municipality, establishing a "direct and immediate interest" in municipal expenditures that might violate the law. *Id*. at 486–87.

Even so, some appellate courts question this municipal taxpayer right as a kind of vestigial relic, given consistent Supreme Court rulings restricting generalized taxpayer

3

standing at all other levels of government—county, state, and federal. *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 733–34 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2583 (2021); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 221–23 (6th Cir. 2011) (en banc) (Sutton, J., concurring).

For municipal taxpayer standing, Plaintiffs must show "a good-faith pocketbook action," such that each plaintiff has a *direct and immediate* financial interest in challenging the municipality's supposedly illegal conduct. *Booth v. Hvass*, 302 F.3d 849, 852 (8th Cir. 2002) (citing *Doremus v. Bd. Of Educ.*, 342 U.S. 429, 434 (1952)). A good-faith pocketbook action consists of "a measurable appropriation or disbursement" of municipal taxpayer funds "occasioned solely by the activities complained of." *Doremus*, 342 U.S. at 434 (citing *Everson v. Bd. Of Educ.*, 330 U.S. 1 (1987)). So Plaintiffs "must actually be [] taxpayer[s] of the municipality" and "must establish that the municipality has spent [municipal] tax revenues on the allegedly illegal action" in a measurable manner. *Huizenga*, 44 F.4th at 811 (quoting *Protect Our Parks, Inc.*, 971 F.3d at 734) (quotations omitted) (brackets added).

At the motion to dismiss stage, where "general allegations of injury, causation, and redressability" were sufficient, the Eighth Circuit determined that Plaintiffs had adequately pled Article III standing as municipal taxpayers. *Id*. at 811 (quotations omitted). Plaintiffs' standing rested on their contention that ISD 11 "spend[s] tax revenues on the allegedly illegal action"—political advocacy during union leave— "because the collective-bargaining agreement requires it to provide up to 100 days of

4

paid leave, and the union does not fully reimburse that expense." *Id*. at 812 (quotations omitted).

With discovery complete, Plaintiffs can no longer rest merely on the sufficiency of general allegations. Plaintiffs must now establish standing "with the manner and degree of evidence" required at summary judgment. *Bernbeck*, 829 F.3d at 646 (quoting *Lujan*, 504 U.S. at 561). This means that Plaintiffs must set forth—either by affidavit or other evidence admissible at summary judgment—specific facts to satisfy each element of standing. *Lujan*, 504 U.S. at 561.

Under Eighth Circuit guidance, Plaintiffs must establish that they are municipal taxpayers in the school district and "that the school district spend[s] tax revenues on the allegedly illegal action because the collective-bargaining agreement requires it to provide up to 100 days of paid leave, and the union does not fully reimburse that expense." *See Huizenga*, 44 F.4th at 811. They must provide evidence that goes beyond "mere speculation, conjecture, or fantasy" for their claims to survive. *Clay v. Credit Bureau Enters.*, 754 F.3d 535, 539 (8th Cir. 2014).

Plaintiffs do not meet their burden. The record does not show that the municipality in the end spends *any* money on the union leave policy, let alone municipal tax revenues specifically. Without evidence of a clear "dollars-and-cents" expense traceable to their municipal tax payments, Plaintiffs fail to meet their burden of establishing standing.

**I.     Municipal Taxpayer Status**

Plaintiff Nancy Powell's status bears separate attention as a municipal taxpayer. She claims standing through property taxes paid by her husband, Dean Powell, on

property he owned before their marriage. The Powells have submitted property tax statements from Anoka County as support for their claim. Those statements name only Dean Powell as a county taxpayer. The Powells also each submitted personal declarations claiming Nancy Powell's interest in the property. (Doc. Nos. 24, 104, 105.) Personal declarations are not enough to establish a legal interest. Submitting nothing further, Nancy Powell has not established that she pays municipal taxes relevant to ISD 11. She lacks standing for this reason as well as for the other reasons below applicable to her co-plaintiffs.

## II.     No Expenditures Occasioned by the Union Leave Policy

Plaintiffs have not identified a measurable ISD 11 expenditure occasioned by the allegedly illegal union leave policy. The record shows generally the ISD 11 funding for teacher salaries and benefits but does not delineate which revenue sources support individual ISD 11 initiatives. Furthermore, there is a lack of detailed allocation within the funding that would enable tracing it back to specific sources of funding. So critically, in terms of Article III standing, it is not possible to link this funding directly to Plaintiffs' municipal tax contributions.

Plaintiffs' proffered evidence fares no better. Plaintiffs contend that the specific cost triggered by the union leave policy is the expense ISD 11 incurred in paying substitute teachers to cover for teacher absences under the union leave policy. Two things are undisputed: first, ISD 11 unilaterally set the substitute teacher rate per the collective bargaining agreement; and second, AHEM fully reimbursed ISD 11 at that substitute teacher rate for all absentee time under the union leave policy. (Doc. No. 96, Ex. 3 at 8;

6

Ex. 7 at 9:17–10:6.) The record reveals that AHEM paid the substitute teacher rate even on the days no substitute teacher was necessary, such as days when teachers had no student contact. (*Id.*)

ISD 11's substitute teacher rate did not exist merely to serve the interests of the union leave policy but was more broadly used across ISD 11. ISD 11 used the substitute teacher rate in two overarching scenarios. Teachers could pay the substitute rate if they wished to take extra personal days abutting scheduled school breaks. And teachers had the option of selling back their excess sick days at the value of the substitute teacher rate. (*See id.*, Ex. 1, art. XIV, § 2, subd. 3; Ex. 1, art. XIV, § 1, subd. 7.) Setting aside attorney arguments, the record contains no internal documents or testimony indicating that ISD 11 at any time incurred a financial deficit because of the union leave policy or that its accounting was flawed in that regard. Furthermore, no expert evidence is offered on the matter.

Plaintiffs' contention that expenses related to the union leave policy exceeded reimbursements relies on a table, attorney-created, that suggests a financial shortfall. (Doc. No. 103 at 5–6.) The table itself relies on unclear data and unfounded assumptions, and lists no actual expenses.[1] For instance, Plaintiffs seek to compare ISD 11's annual

---

[1] Plaintiffs' calculations are rhetorically characterized as "subsidies" to AHEM, and not as specific costs incurred by ISD 11. In their analysis, Plaintiffs calculate what is referred to as an "actual subsidy" allegedly provided to AHEM. They determine this by establishing a "per diem [salary] range" for teachers who utilized leave, which is then multiplied by the number of leave days taken. From this total, they subtract the substitute teacher rate that AHEM reimburses. (Doc. No. 103 at 5–6.) This calculation is based on a spreadsheet crafted by counsel, which records these "actual per diem salaries." But the

7

salaries and benefits for union-member teachers to "per diem salaries," in arguing that the district's reimbursement rate for substitute teachers is insufficient and leads to a financial loss. Yet it is established that ISD 11 pays its teachers an annual salary, disbursed every two weeks, which is not affected by individual days taken off for whatever the reason. Plaintiffs have not directly challenged the rate ISD 11 independently sets for substitute teacher reimbursement—a rate determined to cover various scenarios of teacher absences and attendance. Plaintiffs' table provides no calculation of AHEM reimbursements for when there is no substitute teacher expense, as on days when there is no student contact. No assessment is presented on how those sums affect Plaintiffs' claimed loss calculus. Finally, as with teacher pay, benefits for teachers are determined on an annual basis and are not calculated or prorated daily, as Plaintiffs have suggested. The table and its reliance on unsupported data and assumptions does not establish standing.

  The Seventh Circuit's recent decision in *Protect Our Parks*, 971 F.3d 722, cited favorably by the Eighth Circuit in its previous ruling, provides a useful comparison. *See Huizenga*, 44 F.4th at 811, 812. An advocacy group sought to prevent construction and operation of a center on city park ground, alleging violations of the public trust doctrine. But a separate foundation—not the city itself—was to pay for construction and operation costs. The Seventh Circuit held that although municipal money would be spent on support projects such as road management and utilities work, the plaintiffs did not allege

---

record lacks clear explanation of how they translated annual teacher salaries into daily rates. This detail is crucial, considering the obvious varying work schedules of teachers.

that those expenditures violated public trust, so those payments could not be the basis for municipal taxpayer standing. *Protect Our Parks*, 971 F.3d at 735. Those expenses would not have been "occasioned by" the allegedly illegal act. *See id.* ("If the allegedly illegal conduct is the construction and operation of the Center, and taxpayer dollars aren't being spent on that conduct, then that alone is enough to defeat the plaintiffs' municipal taxpayer standing.").

Similarly, the record here reflects one expense "occasioned by" the allegedly illegal act—the union leave policy—which is payment of the substitute rate on days when regular teachers take union leave. It is undisputed that AHEM reimburses ISD 11 for that payment entirely. Plaintiffs have not shown that this policy results in the kind of actual and non-speculative injury necessary for establishing municipal taxpayer standing. There is no record of an actual unreimbursed expenses, or anything labeled a "subsidy" to AHEM due to the union leave policy, as Plaintiffs contend.

Plaintiffs' claim, at its core, is that ISD 11 should have received *more* reimbursement for union leave, and they contend that the amount ISD 11 *did* receive constitutes a financial shortfall that justifies municipal taxpayer standing. This claim does not present a concrete, direct, immediate, or measurable financial loss. Plaintiffs have not demonstrated that ISD 11 received less in substitute teacher reimbursements than was agreed upon, there is no allegation that the union unduly influenced the reimbursement rates set by ISD 11, nor is there a claim of any agreement between the union and ISD 11 for the school district to subsidize the cost of union leave.

Plaintiffs' argument here is of the same kind made in households every day—that wages should be higher and expenses lower or that government spending should be more, less, or allocated differently. Without more, merely disagreeing with how the government determines rates or prices for its goods or services, including reimbursements, does not grant standing under Article III. It does not establish a loss or injury necessary for municipal taxpayer standing, even if supplemented by taxpayers' subjective assessments. Plaintiffs have not established municipal taxpayer standing under Article III.

### III.   No Traceable Use of Municipal Tax Dollars

Even accepting, for the sake of argument, the assertions that ISD 11 was under-reimbursed for union leave and that not receiving full reimbursement amounts to a financial loss, Plaintiffs' claim fails to establish municipal taxpayer standing for another reason. There is no proof that Plaintiffs' municipal tax payments directly financed the union leave policy, irrespective of the alleged financial shortfall.

Municipal taxpayer standing rests on the principle that taxpayers have a "direct and immediate interest" in how their municipal taxes are spent. *Huizenga*, 44 F.4th at 810; *see also Protect Our Parks*, 971 F.3d at 735 ("It is not enough to simply allege that [the municipality] is spending money; the existence of municipal taxpayer standing depends on where the money comes from."); *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (emphasizing that the interest must be "direct and immediate" to exempt municipal taxpayers from restrictions on generalized suits based on taxpayer status). In the absence of a clear linkage between Plaintiffs' taxes and the municipal expenditure, standing for Plaintiffs is not established. *See Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("[T]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

In examining ISD 11's financial records and sources of funding, there is no clear connection between municipal tax revenues and ISD 11's expenditure on the union leave policy. ISD 11 allocates funds from its General Fund to pay K–12 teachers, while the Community Services Fund covers the costs of Early Childhood Family Education and Adult Basic Education instructors. The record shows that during the 2020–2021 school year, the General Fund totaled $541,941,280. (Doc. No. 96, Ex. 3 at 6). Within the General Fund, $407,576,523 (75.2%) was provided by the State of Minnesota, $26,623,484 (4.9%) by the federal government, and $101,208,533 (18.7%) by local tax levies, with the remainder coming from other non-tax revenues. (*Id.*, Ex. 2 at 28.) The Community Services Fund totaled $21,935,724, with only 13.0% derived from local tax levies. (*Id.* at 52, 53.)[2]

ISD 11 allocated $180,780,264 (33.4% of the General Fund) toward salaries and benefits for K–12 teachers and an additional $1,767,815 (0.3%) for substitute teachers. (*Id.* at 28, 33.) These details underscore that the primary financial support for ISD 11 came from state and non-local sources rather than municipal taxes. The funds were pooled into a general, non-segregated fund. Tax dollars are not specifically earmarked for

---

[2] The percentages do not meaningfully vary across the three years for which budget data has been provided. (*See id.* (for the General Fund, 17.2% from 2018–2019 and 17.7% from 2019–2020; for the Community Services Fund, 13.0% from 2018–2019 and 12.0% from 2019–2020).) The 2020–2021 school year was the most recent school year completed before discovery started and is therefore used as a representative sample.

11

distinct expenditures, making it impossible to attribute any part of the spending directly to a particular source of income, such as municipal tax revenues. (*Id.*, Ex. 3 at 6.)

Plaintiffs have not established a direct relationship between their municipal tax dollars and the specific expenditures of ISD 11 on teacher salaries, benefits, or the hiring of substitute teachers in instances of union leave. They have outlined and applied no methodology by which such a connection could be assessed. "Municipal taxpayers have standing to sue only when they have both identified an action on the [municipality]'s part that is allegedly illegal and adequately shown that [municipal] tax dollars will be spent on that illegal activity." *Protect Our Parks*, 971 F.3d at 736.

The Seventh Circuit, in addressing a similar situation involving a municipal taxpayer challenge and the presence of multiple sources of revenue, stated that "[i]t would be far too simplistic to conclude that the City is spending *tax* money on a project simply because it is spending *some* money on a project." *Id.* at 735–36 (emphasis in original). With less than a fifth of ISD 11's 2020–2021 General Fund coming from municipal tax dollars, and for other reasons stated, Plaintiffs fail to satisfy the requirements for municipal taxpayer standing under Article III.

Without the necessary standing under Article III, this Court lacks subject matter jurisdiction and does not reach Plaintiffs' claims on the merits.

## ORDER

Based on the above and on all the files, records, and proceedings here, **IT IS HEREBY ORDERED** that:

1. Defendant Anoka-Hennepin Education Minnesota's Motion for Summary

Judgment (Doc. No. 91) is **GRANTED** to the extent that Plaintiffs lack Article III standing and therefore subject matter jurisdiction is absent; and

      2.     Plaintiffs' Motion for Summary Judgment (Doc. No. 101) is **DENIED** as moot.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: March 29, 2024                              *s/ Jerry W. Blackwell*
                                                                        JERRY W. BLACKWELL
                                                                        United States District Judge